Will the attorneys who are going to argue the case please approach the podium, announce yourself, or identify yourself and the party you represent, and would the appellant indicate how much time they would like to argue the case. Good afternoon your honors, William Gibbs on behalf of the plaintiffs. I would like to reserve five minutes in rebuttal please. Very well. Good morning your honors, my name is Rob Wise, excuse me from Bowman and Brooke, representing the defendants. Mr. Gibbs, may it please the court. Counsel. Your honors, I am here on behalf of 55 former NFL football players that seek reversal of dismissal of their claims against the NFL's officially licensed helmet provider, Riddell, and associated entities. These 55 players' claims have been dismissed by the trial court based upon a perceived violation of the statute of limitations. We will go through the reasons that the statute of limitations was not violated and seek reversal from this court and remand for trial by the appropriate trial effect. To go back in time a bit into the evolution of what has commonly been referred to as the NFL concussion litigation, a number of players began filing lawsuits in 2011 against the league. Those lawsuits against the league alleged that the league had suppressed information about the long-term brain damage that could and would befall professional football players who played the game at the highest level with the league's helmets, Riddell helmets, that did not and could not and would not protect their brains inside of their skulls from the repetitive head trauma that could and would lead to later in life neurodegenerative disease. And when I use the phrase neurodegenerative disease in the context of former football players, we're talking about an insidious disease called CTE, chronic traumatic encephalopathy, dementia, Alzheimer's, Parkinson's, and ALS. For years, beginning in 1994, the NFL and its helmet provider told NFL players that, A, they could return to the same game or practice after sustaining a head injury without causing any permanent damage, and that playing in the NFL could not, absolutely would not, cause later in life issues. And those mistruths were stated in medical publications, through the media, from 1994 through 2006, when finally, finally, under some questioning from Representative Jan Schakowsky in Washington, D.C., a representative from the NFL said, Well, I guess we have to concede there is some link. Riddell still, to this day, has never conceded such a link. We have advertisements from Riddell in 1947 saying that their helmets would eliminate the risk of concussion. And players wore those helmets in reliance upon Riddell's representations that those helmets would protect their brains. The reality was their brains were not protected, and now former players are suffering. These 55 players filed suit here in Cook County against the helmet manufacturer because Riddell is located here in Illinois. They also issued the discovery rule. Right. They also had filed, 54 of the 55, had filed a lawsuit against the NFL in various locations. Can you address why the discovery rule, the application of the discovery rule, keeps your clients in play? Certainly. So they also had filed in various locations in cases that were consolidated out in Philadelphia in the multi-district litigation that Judge Brody was overseeing that resulted in a settlement. There were no depositions, correct? I'm sorry? There were never any depositions in that case. It's important to note that those cases did settle without a single exchange of a piece of paper in discovery. There was no written discovery, no document production, and there was no depositions taken. And so those players who filed, those 54 who filed out in Philadelphia, filed those lawsuits, and their damages or the facts or allegations of their injuries were never explored or worked up. All that we have is the original filing, and defendants put before the trial court a master amended complaint that was filed on behalf of all plaintiffs, as well as some short form complaints that were literally check the box, so that the court system could kind of be apprised of who was in and who was out on certain claims. There was about 5,000 plaintiffs in those cases, and so the short form complaints were a technique used to keep track of things. But the reality is, is in these cases that are before this court, these players allege that they have been injured and have either been diagnosed with a neurodegenerative disease or are at an increased risk of developing a neurodegenerative disease. And so the court has decided to do a comprehensive analysis of all of these cases, and it's important to note the difference. These are latent consequences of cumulative repetitive head injuries. What did you say could or would? Didn't you say that these could or would end up in these injuries? I'm not sure what I said, but what I will tell you is that players who played in the NFL and suffered repetitive head trauma while wearing Rydell helmets are at an increased risk of developing neurodegenerative disease. And those are the allegations here. And then in addition to those that believe they are at an increased risk, we also have more than half who have actually been diagnosed with neurodegenerative diseases of the likes of Alzheimer's or dementia primarily, because CTE, at least according to current medical technology, cannot be diagnosed until after death. So they may have CTE, but we won't know it until they die and their brain is examined by a neuropathologist who takes a look at that brain. So would half the claims be premature? They would only be for increased risk of harm. About 40% of the cases may only be for increased risk of harm. Now, it's difficult to determine when it is that the symptoms of these neurodegenerative diseases manifest themselves. And what I mean by that is the classic presentation of CTE begins with mood and behavioral disturbances. Mood and behavioral disturbances are hard to distinguish or recognize as necessarily linked to playing a game of football. Sometimes memory is the next thing that's seen in a CTE patient. Well, as human beings age, there can be memory issues. And so it's often hard to know when someone is suffering from irritability, mood or behavioral disturbances, memory loss related to football or related to the aging process. So these are the latent injuries. The standard is they knew they had an injury and it was wrongfully caused. And if the injury is increased risk of harm, well, didn't they know that when they filed the NFL claim? Many of them, when they filed their NFL claim, alleged exactly that, that they were at an increased risk of harm. And so then, if a player has triggered some discovery at that point, does a two-year statute of limitations apply or a five-year statute of limitations apply? Because the conspiracy allegations are such that, well, they'll certainly conceal from players this injury and that this injury might be due to a career in professional football. And so then it would be a five-year statute of limitations pursuant to the fraudulent concealment statute that we say. What's the affirmative act that gets you to fraudulent concealment? I'm sorry? What's the affirmative act on behalf of Bordell that gets you to fraudulent concealment? I apologize. I don't speak loudly. That's okay. That's okay. We arrange. This would be paragraph 78. The one I'm citing to, because there's a number of complaints, but the one I'm citing to comes from the record at C3893. Paragraphs 78 and 79 summarize our conspiracy allegations. And the Rydell defendants engaged in a multi-decade conspiracy to limit their own liability by concealing and or misrepresenting and or omitting information about head trauma and football from the football community. Along with its co-conspirators, the NFL and others, they agreed to engage in a long-term plan to conceal material information about football's link to brain damage. Further, in paragraph 79, Rydell's participation in this conspiracy was a substantial factor in plaintiff's injuries by and through their role in that conspiracy to conceal this information. Rydell did more than fail to take action to protect and or inform players of true risks and hidden dangers associated with exposure to repetitive head trauma in football. Rydell contributed to the propaganda of junk science. Sixteen articles, medical publications, in which Rydell was a participant with the NFL, that said there is no long-term problem and you can return to play in the same game. And also deceptively marketed its helmets with actual and or constructive knowledge that their helmets could not protect against concussion. So those are the affirmative actions that lead to the five-year fraudulent concealment statute. Now, I argue that really it's two years from the date of diagnosis. That should be the purpose. There's a question, as I see it, and I will concede to my colleagues. You're relying on the discovery rule. Yes. And the discovery rule is I discovered that my injury was tortiously caused, right? Yes. At what point are you saying that these plaintiffs discovered the tortious injury? When do you say that happened? The easiest answer to that question is at the date of diagnosis of a neurodegenerative disease. Okay. And when was that in relation to when you filed your lawsuit? Was it 20 years before you filed the lawsuit? In this case, five years, two months? When was it? So my answer is going to be a little long-winded. I apologize. But what happened is when the NFL settled their case in 2015, the settlement created a construct whereby all former NFL players could go and get baseline testing to determine whether or not they had a neurodegenerative disease and or they could submit a diagnosis from an independent doctor or what's called a monetary reward fund doctor demonstrating that they had a diagnosis. All of the diagnoses of our players happened within two years of filing the complaints at issue in this case. So all your plaintiffs here, broadly speaking, learned of their problem, their injury, as a result of the NFL settlement where they were sent to somebody to get examined? I wouldn't say all in that way because you could have gone to your own doctor and gotten that diagnosis, but that certainly triggered the vast majority of diagnoses because now they're tuned into it and now they can get the full neuropsych workup. So they were parties to the NFL suit not knowing whether they were injured? That is exactly the kind of question of fact that needs to be explored in these cases. And I understand that those are tough questions that the defendants will ask of these plaintiffs at their depositions. Why did you file a lawsuit against the NFL in 2013? What were you experiencing then? What did you claim you were experiencing then? Who had diagnosed you? No one is the answer to that, but who had you talked to about that? Those are all questions of fact. Within two years of the filing of this lawsuit, I or all of us or most of us learned that we had this CTE or variant of it? Yes, and to be honest with you, some of them have been diagnosed after filing the lawsuit. And some of them haven't been diagnosed yet? And some of them haven't been diagnosed yet. It meant that it concealed. What about that Supreme Court case, Morris v. Margulis, that says that if at the time plaintiff discovers the fraudulent concealment, a reasonable time remains within the applicable statute of limitations, then that section doesn't toll the running. How does that? It really does test with what we've just discussed, which is what is the applicable statute of limitations? It's for a latent injury. And if we look back to URI versus the URI case, U-R-I-E, which is the Supreme Court case, we look back to Vassal. We look back to Moon v. Road. We look back to Rose v. NCAA, DiCarlo v. NFL, Schmitz v. NCAA. It's from the date of diagnosis. So we're in sort of a strange situation where when filing against the NFL, a player may not have been diagnosed, and actually in this case was not diagnosed. So he gets the benefit of the five years tolling because his statute of limitations hasn't even begun to run yet. And then at the moment that his statute of limitations begins to run, which is when he's diagnosed with a neurodegenerative disease, he should be, his fraudulent concealment tolling may give him only two years from that point. Did I thoroughly confuse the issue? No, I understand what you're saying. It's just that, as you said, I did use the word strange, but it's an unusual situation. It is unusual. There's no way I can deny that. You know, filing lawsuits but maintaining you didn't know you had an injury and that it was wrongfully caused is an inconsistent position that I'm struggling with a little bit. Well, if we go back to the Nolan case, Nolan v. Johns Mandel, which is sort of a seminal case on asbestos exposure, Mr. Nolan worked as an asbestos insulator from 1941 to 73, except for some time he went away to war from 43 to 47. And in 57, he started to get shortness of breath, increased difficulty climbing stairs, and went to get a chest X-ray. He was diagnosed with, quote, lung problems at the time. 1957, that's what he was told. In 1965, he noticed his earlier complaints were becoming more pronounced, went to another doctor, had chest X-rays, and those findings suggested generalized pulmonary fibrosis. In the records in 1957, a Dr. Clomkin told Nolan, I think you have pulmonary fibrosis secondary to asbestosis, 1957. Nolan filed his lawsuit in May of 1975 because he was diagnosed in May of 73 with asbestosis and tuberculosis. And the Nolan court said pretty clearly, these are unusual situations because you've had exposure to something over a lifetime. There are certain things that might show up, certain symptoms that might show up, but as to when you can figure out when the discovery rule triggers and when that statute of limitations begins to run, you have to go to the diagnosis that you're complaining of. And that really gives us guidance, I think, on our case. But in that one, they were trying to make a distinction between cancer and asbestosis, I believe, if I remember correctly. That's actually the sale. The sale is where it is. I'm sorry. I'm sorry. But here it's the same injury we're talking about. We're talking about CTE and dementia and Alzheimer and ALS. And that was the NFL case. We're related to those and increased risk of those. And that's what this case is, right? Same injuries. It really is not the same injuries because at the time of the NFL case, nothing had been diagnosed. So it's kind of like the sale, which is the case where he'd been diagnosed with asbestosis. I can't remember the specific year, but about six years later, he's diagnosed with lung cancer related to asbestosis and assumes I'm a lung cancer. And the court says, well, that's when his discovery rule triggered as to that injury. And that's really this case. In 2012 or whenever it was that a particular player may have filed a lawsuit, he had the lung problems that no one had 20 years before ever filing a lawsuit. And he was concerned about it, and there were fellow players that were filing lawsuits, and there was some indication that if a critical mass could be put together, maybe there'd be a settlement. And so that player did that. Now, that's an interesting cross-examination at trial for the trial of fact to decide whether or not that should have been a trigger of some kind of statute of limitations. But it's really not a matter of law that is so clear that these cases should have been dismissed. And that's why we're here. Go ahead. Well, given your conspiracy argument, it seems as though the claims that they now have against Riddell or the claims that they had against the NFL would be the same, that they should have had those same claims against Riddell then. But Riddell was never a part of that loss. So if you're claiming it's conspiracy theory, which you claim has lasted since I believe you said 1947, well, I think the conspiracy started in 1994. But you said advertisements started in 1947. Yes. So help with that a little bit, that the claims, they didn't know they had a claim against Riddell, and the claim was filed against the NFL? Yes. They did know. I believe that the evidence. Yes, they did know, or are you saying yes, they did know? Yes, they did not know. Yes, they did not. That they had a claim against Riddell. Now, defense counsel is going to stand up, and I understand the argument. He's going to say, but other guys in that litigation did sue Riddell. Because Riddell was a defendant in that, but if you didn't check the box, I don't know what they were, but there was no claim against them. As to that individual player. As to that individual player. That applies to 53 of the plaintiffs in this case, correct? 54 of them. I'll get to the 55th in a second. But none of them checked the Riddell box. None of them checked the Riddell box. And so, you know, questions need to be posed to them as to what they knew at the time about Riddell's involvement in this conspiracy. I will suggest to you that they didn't know anything about it, and that Riddell's involvement has been revealed to them, and then they filed a lawsuit against Riddell. That would be their testimony. I guess that just gets so fat-questioned. I mean, it just strikes me that a helmet, concussions, hard to... I'd like to put Mr. Weiss at ease. You'll get plenty of time. We're not just... We're not trying to resist the argument. Well, I should speak up. You'll get plenty of time. We're not going to hold you to your 20 minutes because Mr. Gibbs is so eloquent. We're just mesmerized by his conversation. I take it back, because that's a fat question. And that's what really kind of, as you wrestle with this, what I think it really all comes back to is that there are a number of fat questions that need to be explored through discovery, and hopefully we won't be back here before you after a trial. But these are strange and interesting and a bit demanding issues, but this is exactly why we have the process that lets those fat questions go to a jury and figure it out that way. So in closing, as to the 54, and I'll get to the 55th in a second, at most these prior filings consist of what I would call evidentiary admissions, at most. They're not judicial admissions because they weren't filed in the same case. They're evidentiary admissions that can be used to cross-examine these plaintiffs at a later date, but they're certainly not sufficient judicial admissions that would make only one conclusion possible, and therefore dismissals should be reversed and these cases should be remanded for discovery and trial. Now, as it relates to Mr. Nakamura, Nakamura did not file a lawsuit against the NFL. Nakamura suffered a career-ending concussion in 2013 and filed some disability claims, which he's entitled to, pursuant to the collective bargaining agreement that the NFL has, whereby he can apply for what's called total and permanent disability, which means I can't play football anymore because of an injury and I'm entitled to some benefits pursuant to the collective bargaining agreement. He also had a Lloyd's of London insurance policy, which you may or may not know a lot of professional athletes carry, to insure them against career-ending injuries. And so when a player sustains a career-ending injury, Zion Williamson actually had one on himself this year, you can then insure yourself against that loss. And so the documents that were placed before the trial court were all related to his disability claim and or his fight with Lloyd's of London for those insurance benefits. I will submit to you that that has absolutely nothing, nothing to do with his claim of neurodegenerative disease, latent neurodegenerative disease as a result of playing professional football. It has to do with an acute concussion and that's a very, very different injury. One can have a concussion that ends their football career at an acute level and whether it's that concussion or all of the repetitive head traumas that that player has had throughout his career sets them up for neurodegenerative disease as a latent injury later on. But that's, it's a little different so I just wanted to address it. I apologize for taking too much time. No problem. Thank you. Do you have anything else you want to cover? I'm sorry? Do you have anything else you want to cover quickly? No. Okay, thank you. It's Mr. Weiss, correct? Yes, Your Honor. Very well. May it please the court, counsel. Throughout the presentation there was some discussion about in general what the other litigation was about. I hope to go back a little bit to the same point where Mr. Gibbs started regarding the lawsuit that was filed because I think there were some questions and I want to make sure that our briefing has been clear on this point. When those lawsuits originated, the first three originated in L.A. There was another one out in the East Coast area and they soon thereafter went up through the Judicial Panel on Multidistrict Litigation and an MDL was formed in Pennsylvania. And then you started getting more and more lawsuits. Those first three lawsuits involved both the NFL and Rydell. And as more lawsuits were filed, some were only against the NFL. For instance, if they would file, say, in Texas, they only alleged claims against the NFL. And that was all of these plaintiffs. They came up through lawsuits that originally did not name Rydell in them, in their originals. When they got into the MDL, they then became completely subsumed by a master complaint such that anyone who had filed previously and anyone who would file later and get transferred into the MDL would be subject to that master complaint with its allegations. That master complaint was as against both the NFL and the Rydell entities through separate blocks of paragraphs. But the whole thing, that whole giant master administrative complaint, alleged claims against the NFL and against Rydell. And we've got that master complaint in the record in Volume 5. Now, after that, the CORE Act had a process for those short-form complaints, or SFCs, where, as Mr. Gibbs alluded to, lawyers would go through and from the master complaint decide who they wanted to sue. And we've taken snapshots of one of those in our brief. And as is very clear from that, you cannot get from A to Z through that short-form complaint without deciding to check a box or to not check a box as to Rydell. There was nothing hidden. There was not a separate short-form complaint for those with claims against Rydell. There was one short-form complaint. There was one controlling master complaint. It was later amended, but it still included Rydell. So that's a first important point, is there were only those operative pleads in that litigation. So if you did not check the Rydell box, what does that mean? It means you were not pursuing claims against Rydell. You were only pursuing claims against the NFL for whatever reason, and we do not know. So the plaintiffs in this case did not pursue Rydell in the NFL case? They did not. And if there was some reference to Rydell being the official helmet of the NFL, for whatever purpose he was saying that, that does not mean that Rydell was the only helmet worn by players in the NFL. Well, that's a whole different thing. It is. I just wanted to make clear that it wasn't as if they had it. All these plaintiffs did not check anything against Rydell? Yes, they did not check any boxes for Rydell. And, in fact, some of them even crossed out, which I can get into on the SFC because they used a prior version. They crossed out references to the Rydell defendants or all defendants and said NFL. What difference does it make? I thought that it was just simply injury, wrongfully caused, that you didn't even have to know who the defendant was for the statute to start running. So what difference is this Rydell being involved or not involved? Exactly wrong. And that is true from the law. There was a point Mr. Gibbs had made. Exactly. What does it mean? I think Mr. Gibbs was saying that his players didn't know that Rydell was involved. We were saying, to your point, legally, it doesn't matter. Factually, there's no way they could not know because it's in their own complaints. Rydell's name is in their own pleadings. Is it here or in the NFL? In the NFL MDL, yes. The second thing that we did not hear about was actually what they alleged verbatim in that litigation. What they alleged in that litigation, in the amended Master Administrative Complaint, as well as the process for the Master Administrative Complaint, was that these plaintiffs, the same plaintiffs here, the 54 at least, not Mr. Nakamura, have quote, sustained repetitive MTBI, mild traumatic brain injury, while in the NFL and now suffer from latent neurodegenerative disorders and diseases. We also heard that none of them were diagnosed. Mr. Harris, Plaintiff Harris, alleged that he was quote, diagnosed as having a neurological disorder and chronic brain injury. That's at the Common Law Record 4859, paragraph 136, volume 6. And what I quoted from the amended Master Administrative Complaint was from the Common Law Record 4390, paragraph 21, volume 5. In addition, they also alleged in the Master and amended Master Complaint that they had sustained brain injuries that are progressive and latent. And they further alleged in their short form complaints, all of them, regardless of whether they checked the box against Riddell, that they had quote, symptoms of brain injury caused by repetitive, traumatic, sub-concussive and or concussive head impacts, end quote, that quote, arise from injuries that are latent and have developed and continue to develop over time. And that's a key point because they want to rely on the Nolan case. The Nolan case makes a distinction, or the Vassal case makes a distinction, looking back to Nolan, as to progressive as opposed to what they want to argue as a separate injury. They were not alleging and they have not alleged properly any separate injuries. They certainly didn't in the NFL and DL. What they alleged there was that these are progressive injuries. They had symptoms. They were going to progress. Moreover, everything that they had talked about here, about CTE, Alzheimer's, Parkinson's, those ailments and those conditions, were alleged as part of that progressive continuum that they mentioned in their NFL and DL pleadings. So there's nothing that was unknown to them back then when they filed. So yes, our point is you knew that there was wrongdoing. You alleged that there was injury. Riddell was right under your nose, even though you didn't even need to know that. You were on inquiry notice. But the only inquiry you needed to do was read your own pleadings that were signed on your behalf to know do I have a claim against Riddell? Should I have a claim against Riddell? So everything was there. And so we don't even have to go into the other body of case law. They talk about the concussion mitigation cases, the McCullough case, the Schmitz case, the DiCarlo case, because in those cases, the argument being made by the defense was essentially because you played football and that's where you sustained concussions and now you're saying that you have latent injuries from that, the limitations period began to run from when you played football. That is not our argument. We're not forsaking that argument for a later day should we ever need it. But we didn't need it here because with respect to these plaintiffs, they had already alleged they knew everything that they needed to know and were on inquiry notice and the statute of limitations began at that point. So that's why those cases are basically non-starters. They're simply not on point with what we have here because none of them involved prior claims, prior litigation involving these exact same injuries and ailments. So you raised a statute of limitations defense in your what, motion to dismiss? Rule 619, motion to dismiss. Yes, Your Honor. And you relied on what to say that these plaintiffs knew about their injury more than two years before they filed this complaint? Yes, Your Honor. What did you rely on to support their contention? When we learned that this was going on, that we had plaintiffs who were in the NFL and DL, we approached Judge Ehrlich and said, we think we've got an issue that's going to be systemic. Yeah, what did you file in support of the claim that they knew about this two years, more than two years before they filed the complaint? What we filed by the omnibus briefing procedure that we came up with for this, which was discussed and counsel agreed to, was we submitted an addenda, an appendix for all of them. For each one individually, we had a timeline that laid out what they alleged, when they alleged it, where, in which stage of litigation, where that allegation could be found in the master complaint, short form complaint. Their original complaint that was transferred in. And then for each of them, we also included all of those pleadings. Their original complaint that they filed that was later transferred into the MDL. Sometimes they filed directly into the MDL. The master, the amended master, the short form complaint. All in full. That's why, Your Honors, unfortunately I have a multi-volume record here, is because we filed all of that, and that's what Judge Ehrlich had before him, were all of their filings that all of these plaintiffs had made per that agreed upon omnibus procedure. And in response, there was nothing that was filed factually in response by the plaintiffs. On the motion to reconsider or to clarify, there was an affidavit only from counsel, but again with no facts, no evidence in support. Nothing behind it. And that spoke only in, again, vague terms that the justices have heard here today, that some were later diagnosed. At no point has it ever been stated who was later diagnosed, when, with what. There are no facts on that to support. The record is devoid on any facts as to who. And we heard that some of them had not been diagnosed. That's been the case since that motion to clarify as well. We don't think it makes any difference at all. But I would just simply point that out, that on that additional point, the evidence is not there and not in this record. Turning to, and that goes to the point too, that when a party is going to rely on the discovery rule, the party must plead the facts to support the discovery rule. What was discovered when and why was it not knowable before? None of these plaintiffs pled any of those facts. In terms of fraudulent concealment, first, again, we don't think it applies legally, nor does it apply factually. It doesn't apply legally because, as Justice Griffin pointed out, the Morris case, which we cited and was not distinguished in their reply brief, that they knew everything they needed to know. That, according to them, they had, and they say now, they have five years from the filing of the NFL litigation, because, according to them, apparently that's when they knew. Well, if that's the case, the discovery rule kicks in. And they had two years from that point to file suit. That's more than enough reasonable time under the Morris case. Factually, it does not apply because there are no facts. As, Justice Walker, you were asking for, what are the facts about what they did? And all we heard was that it was the fraudulent concealment and conspiracy allegations as a cause of action. That is distinct from fraudulent concealment as a tolling doctrine. It has not been pled here as a tolling doctrine, much less with any facts. Another point is only seven of these plaintiffs even actually pled fraudulent concealment as a cause of action, which is not enough. But I would just point that out because that is not a card to reversal as to all of them, even if everything else fell the plaintiff's way on this, because the vast majority of them didn't even please fraudulent concealment as a cause of action. I was going to turn to Mr. Nakamura, unless your honors have questions more about the 54. Well, is it your position that if the plaintiff had headaches and memory loss but didn't sue the NFL, their claims would still be barred? What I would say is that we would not have taken it up at the same time. We may argue that later, and we may, as Mr. Gibbs found out in discovery, have determined additional facts. But I'm not sure if headaches, that may be along the lines of head problems like lung problems in the Nolan case. And it may not on its face, on the pleadings, be sufficient. And that would then fall more in line with the concussion cases that they have cited where that was all that the plaintiffs had pled and the court said, I can't rule on a motion to dismiss. The purpose of our filing here, and I would point out, Judge Ehrlich did not dismiss a number of other cases that we had moved to dismiss on different grounds, including on the basis that this concussion litigation and these allegations have been in the news since, as Mr. Gibbs pointed out, 2011. Judge Ehrlich said, I don't have enough on that, on this point. So he was not using a broad sword on these cases. Rather, he was looking at specifically the instance of because of what they said and what they specifically pled. And because they filed suit, that was why these cases fell in this bucket. Well, Mr. Gibbs contends that so you're relying on what they filed as pleadings. Yes. Because you had no discovery, right? Yes. Correct. Okay. So Mr. Gibbs contends that those are evidentiary at best, evidentiary admissions, not judicial admissions. And are you contending that an evidentiary admission is sufficient to defeat any issue of fact that may exist as to whether it was filed within the statute of limitations? I'm not saying, I guess, that's – well, first of all, I would say I'm not sure what facts could come out that wouldn't be directly contradicting to this. I have not heard from Mr. Gibbs explain why that – where that distinction was raised to the court below, because we did not hear that explained to the court below. But in terms – we're not arguing a sample. What we're saying is these are their statements, and the court looked to other case laws. Well, the statement – they're not deposition statements. They're not affidavits. They're pleadings filed on behalf of a plaintiff in a prior litigation in a different venue that Mr. Gibbs contends at best is an evidentiary admission. Yes. And is an evidentiary admission sufficient to rely on to defeat a cause of action on the grounds of it being filed outside the statute of limitations? Well, in terms of a distinction between judicial and evidentiary admissions, as I said, that was not argued at any point. And I'm not prepared at this point to say is there any effect to that. I'd be happy to submit something supplemental. What I would say is that this – the Illinois law has looked to prior litigation and was there a prior lawsuit filed. They've also – these cases on 619 have looked to other information about what was known, medical records, things like that. So these are – and none of these plaintiffs disavowed any of these statements. And they were statements that were made to courts of law under state court counterparts to Rule 11, in most cases being filed in federal court, and certainly once the AMAC came out to Rule 11, that these were their statements to the best of their information and belief standing by those. So I've not heard – cited in any of the briefings so far that there's been any contest to these admissions being sufficient – or these statements being sufficient to support these dismissals on those grounds. I will turn to Mr. Nakamura at this point, if I may. Regarding Mr. Nakamura, again, what was not discussed was what actually he said in filing what he filed. Mr. Nakamura sustained a concussion that ended his football playing career in August of 2013. He was cut then from the Panthers shortly thereafter. He filed an insurance claim beginning in November of 2013, claiming permanent disability from post-concussion syndrome. He then filed – With permanent disability, does that mean he can't play football? Or does that mean he can't fly an airplane or something? I don't know. What else? It definitely means he cannot play football again, and that was in the submitted materials that accompanied his lawsuit against Lloyds of London, which he later filed. Whether he could take on any other kind of employment is not certain, but for purposes of his claim, as I understand it, him not being able to return to football is what triggered his entitlement to benefits under the NFL retirement plan. Basically, he was prematurely retired under his argument and also was sufficient to trigger his Lloyds coverage. There was no requirement that he could not sustain any other employment. But doesn't that get to the latent nature and things that he wouldn't know at that point? Because by not playing football, does that go to, hey, don't hit your head anymore? Well, how I would answer this, John, is to say that it matters what he alleged there, and especially in his Lloyds of London complaint, and what he alleged here in comparing those. Because what he alleged in his Lloyds of London lawsuit, and this is found in the common law record for Mr. Malcolm Miller's case at page 93 to 94, is that both his treater, beginning in early 2014, and the NFL's medical advisory board physician, who he went to for the retirement plan later on, diagnosed him as, quote, totally and permanently disabled due to chronic post-concussion syndrome. So they both diagnosed him with the same thing. His treater was diagnosing him with that same thing beginning in 2014, as established by his submissions accompanying his lawsuit. I was just going to close the loop on that to point out what he alleged here, specifically. And this is at the common law record at pages 14 and at pages 16. He said he suffered injuries of a personal and pecuniary nature, which were not discovered until he was diagnosed with a permanent disability due to chronic post-concussion syndrome. Chronic post-concussion syndrome is the same thing that he alleged his doctors, his treater had been diagnosing him with since early 2014. It's the same thing he's sued for here. So we're not talking about, you know, some nebulous injuries he didn't know about. It's the exact thing he said that triggered his lawsuit here. His own filing showed he knew about more than two years before he filed here. But wasn't his situation a definable injury? In other words, they carried him off the field and he never played again, as opposed to the ongoing series of concussions that are frequently what's alleged. Yes, Your Honor. And in that capacity, as we said in our brief, that this case is more akin to the Goma case and a sudden traumatic event, which nonetheless can trigger, if it has any latent aspects to it, then those need to be part of a lawsuit brought within two years. But this is not a situation in which he sustained a concussion, thought he was all better, and then ten years later something has developed. But wouldn't we get into fact issues then as to these issues as opposed to, because of the nature of the claim, coming from a specific injury as opposed to a series? Well, I think the fact issues are defined as he defined them. He's suing here because of chronic post-concussion syndrome. And he said, that's what I had and have had since early 2014. Because he was, in his lawsuit, told lords, you need to pay me because consistently everyone who saw me has diagnosed me with the same thing. In his words, they all diagnosed me with chronic post-concussion syndrome. And now I want to sue Rydell, to Justice Griffin's point earlier, you were playing football, you knew you were wearing a helmet, and you don't need to know Rydell's entity to know that there was some wrongdoing if you had this injury. So you're saying that chronic post-concussion syndrome is the same as CTE, dementia, Alzheimer's, or ALS? Or are they different? I'm not saying that. I'm saying that this injury, as they've alleged it, is on that progression. But what I am saying is what he sued for specifically here is chronic post-concussion syndrome. That's what he said, I've got. And he was, according to him, he was on that continuum in August of 2014. So to... That might bring you back to the asbestos-type cases where I have a chronic cough, I have a chronic irritation in my lungs, I'm chronically in bad shape, I can't go back to the Johns Manville point. And then 20 years later, it turns out that, no, you have asbestosis. Oh, gee, now I've got asbestos. You know, where this fellow was hurt on the field, was precluded from playing anymore because of this, quote, chronic injury he suffered then, now, taking the complaint in the light most favorable to him, now I found out that this is life-threatening or CTE-related, much more than, much different than my injury at the field. And I had arguably complained. Now, why I say this is not like the asbestosis cases and the asbestos cases is because in those cases, where they really hinged on was, did the plaintiff know that whatever he had at that time, for instance, the lung problems early on, were those caused by your conditions at work? There is no question here that Mr. Nakamura knew that his head injury, his concussion, which he got while wearing a Rydell helmet, according to him, he sustained while at work and while wearing a Rydell helmet. And in this case, Rydell helmet is sort of akin to being at work, as the plaintiffs would like to characterize it. So he knew everything he needed to know. He knew that his helmet did not protect him from getting a concussion that left him with chronic permanent disability from chronic post-concussion syndrome. He knew that the moment he got that concussion and was diagnosed with that concussion. That began in August of 2013, but certainly by early 2014, when he first saw Dr. Collins, Dr. Mickey Collins, that's when he said, I was first diagnosed with chronic post-concussion syndrome, which is the same thing he's suing for here today. And that is, according to them, on that progression. So it's a permanent disability. It's a lifetime disability, according to him. It seems as though his injury was an acute situation based on an injury on that particular day, as opposed to what this latent injury that comes with CTE. I think that's what counsel is arguing. How do you respond to that? I would say that he. He should simply say that he sees the two things, saying that it's a chronic injury in 2014, and he's saying it's a chronic injury today. That would be your response, I guess. Well, under Illinois law, we do not need to know the full manifestation of injury in order to file suit. So what he knew was enough for him to file that claim, and what he knew was enough for him that he should have been filing a lawsuit if he wanted to blame his helmet for his condition. And what he's alleged here is, and I am at future risk for things down the road. Well, that can still be the case, and it may never be the case, and he may never be at risk, but that is something that he could pursue in his claim. But to say that he can never file a lawsuit until he gets the full manifestation of his injuries, that's not Illinois law. So he knew enough. He had an injury. He knew he had an injury. He knew his helmet didn't protect him from that injury. And more than two years later, he's coming in saying, but my helmet should have protected me from that injury. And that's what we're saying he can't do, is after those two years, come in and say that. And in terms of it being latent, if he's saying that I'm at risk, as Mr. Gibbs has said, some of those 54 are saying that maybe they're merely at risk for future progression. But here it's progression, and that's what we're talking about, is he had an injury that was on that progression continuum according to their complaints. So that's what started the clock ticking for him. If he wanted to pursue Riddell, then the time to do that was within two years of when he knew he sustained that injury, and certainly in no case later than when he knew about the initial diagnosis of CPSC, as he is suing for here today. Can he still join that other suit? The NFL concussion litigation? At this point, it's already been, the settlement's been approved, and so if he has not opted out of that litigation, I don't believe he has opted out of that class action, then he may be entitled to take some benefits from that litigation, as the other 54 may be able to, depending on their condition. And I do, if I may, indulge in one last point, Your Honor. Going back to where I started with the NFL concussion litigation, it was resolved with respect to the NFL by the creation there of a third complaint, I would call it, which was a master class action complaint, which only involved the NFL, because the claims against Riddell were not being settled. So they created a separate class action for that purpose, but that has nothing to do with the allegations that were raised by these plaintiffs when they were in lawsuits. So is Ed Lawson still alive with respect to Riddell? It is, Your Honor. The master litigation? Yes, the MDL still proceeds. I'm not sure if there are any individual plaintiffs that are proceeding against only the NFL, but the claims against Riddell still remain in that MDL, yes. Unless there are any further questions, I thank you, Your Honor, for your time. Thank you. Briefly, because I know it's been a long afternoon. It's all your fault. It was. I admit that. Why don't you start where Counselor left off and just kind of quickly respond to the fact that in 2014, there was this chronic injury alleged, and that's the same thing that's being alleged in the current lawsuit before this court. Yes, so Mr. Nakamura filed his lawsuit in October of 2017 after the court had granted dismissal on the 53. And I will be honest with you, it was done to ensure that his case would survive because he was diagnosed with a chronic post-concussive syndrome on October 8, 2015, and so his case was filed October 5, 2017, within two years of the diagnosis of a chronic condition. Now, he alleges injuries of a personal and pecuniary nature, which is what we do in every single lawsuit. We don't say, I was in a car accident, and as a result, I broke my hip, my leg, my ankle, and I'm going to require four surgeries. We say he has injuries of a personal and pecuniary nature, which then the discovery process reveals specifically what they are. What I'm telling the court is that on Nakamura, he has a chronic condition, certainly, that he could be compensated for. But a much more significant component to his case, as with all these cases, is the increased risk of CTE, dementia, Alzheimer's, Parkinson's, ALS. That is the latent injury. That's much more, counsel said, it's merely an increased risk. I will tell you, to know that you might be facing that someday, that's a big deal. And that can be compensated under Illinois law, even if it's not diagnosed. We sort of talked about that before. You can be diagnosed if a doctor says you have 20 percent chance to develop these things down the road. Under Illinois law, there's IPIs on that. So that's the Nakamura issue. Did I answer your question? You did. Okay, great. Thank you. And then the question was, why not check the box? I think that counsel mentioned the box that was signed on their behalf. It was not signed by them. It was signed in another jurisdiction. We did raise the issue that you can't be held accountable as a judicial admission for something that someone else signed in another jurisdiction. We did raise that. We said that all along, that this is not sufficient evidence to defeat a claim. This is not the kind of stuff that defeats a claim. A sworn deposition testimony in which you admit something, that might defeat your claim. But something that's filed elsewhere on your behalf is not. And, you know, it's really like the Moon v. Road case that we cited. In that case, the plaintiff's estate filed suit against two doctors within two years of the patient's death. Subsequently, records were reviewed, filed against an additional doctor outside of the traditional two-year statute of limitations, and Justice Tice said, I can't conclude as a matter of law that this claim is barred. There are factual questions here as to who knew what when that preclude dismissal. And that's why today we seek a reversal of dismissal and remand. If there's any further questions, I can certainly address them. Thank you. Thank you very much. On behalf of my colleagues, I'd like to thank both sides for their briefing on this issue. It's a very interesting case, and you both did a nice job on it. We appreciate your efforts in this regard. We'll take the matter under advisement. The court stands to recess.